UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/15/18

EKLECCO NEWCO LLC and EKLECCO L.L.C.,

Plaintiffs,

-against-

TOWN OF CLARKSTOWN, TOWN BOARD OF THE
TOWN OF CLARKSTOWN, THE TOWN OF
CLARKSTOWN PLANNING BOARD, and GEORGE
HOEHMANN, as Supervisor of the Town of
Clarkstown,

Defendants.

No. 16-CV-6492 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs EklecCo NewCo LLC and EklecCo L.L.C, (collectively, "EklecCo"), bring this action pursuant to 42 U.S.C. § 1983, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and New York state law against the Town of Clarkstown (the "Town"), the Clarkstown Town Board (the "Town Board"), the Clarkstown Planning Board (the "Planning Board"), and the Supervisor of the Town of Clarkstown, George Hoehmann, alleging that Defendants coerced them into surrendering certain constitutional rights in exchange for the discontinuance and conveyance of public roads that were necessary for the continued development of the Palisades Center shopping mall. Plaintiffs additionally allege that, in so doing, Defendants also violated their Fourteenth Amendment equal protection rights.

Presently before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint pursuant to 12(b)(6), for failure to state a claim, and 12(b)(1), for lack of subject-matter jurisdiction.

For the following reasons, Defendants' motion to dismiss is GRANTED.

# BACKGROUND

## I.    Factual Allegations[1]

### A.  Initial Approval of the Palisades Center

In 1985, Plaintiffs' predecessor in interest[2] began acquiring and/or optioning parcels of land located within the Town for the purpose of constructing a regional shopping center. (First Amended Complaint ("FAC") ¶ 31, ECF No. 18.)

On June 12, 1987, EklecCo petitioned the Town Board to rezone several of its recently-acquired parcels of land to a Major Regional Shopping district, thereby allowing EklecCo to develop "the full range of commercial shopping center services" in that location. (*Id.* ¶ 34.) After a lengthy review of EklecCo's petition, the Town Board passed a resolution and amended the Town's Zoning Map to "permit the construction of a regional shopping center to be known as the 'Palisades Center'" on EklecCo's land—subject to certain environmental and traffic remediation measures (the "Rezoning Resolution"). (*Id.* ¶ 36.)

On May 10, 1989, EklecCo applied to the Planning Board for a preliminary site plan approval for the Palisades Center to include 875,000 square feet of gross leasable area ("GLA"). (*Id.* ¶ 37.) After conducting a preliminary site plan review, the Planning Board granted EklecCo preliminary site plan approval and permission to begin excavation and rock removal on February 28, 1990. (*Id.* ¶ 38.)

Around this time, EklecCo also sought permission from the relevant federal and state

---

[1] In considering a Rule 12(b)(6) motion, a court is limited to the facts alleged in the complaint and is required to accept those facts as true. *See Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017). Accordingly, the following facts are taken from the First Amended Complaint and are presumed to be true for purposes of Defendants' 12(b)(6) motion to dismiss.

[2] EklecCo and its predecessors in interest will be collectively referred to as "EklecCo" for the purposes of this motion.

authorities to proceed with the road improvements required by the Rezoning Resolution, including the construction of a "ring road" that would encircle the developing mall and connect to surrounding roadways. (*Id.* ¶¶ 39–40.) As part of the permitting process for that portion of the mall development, the New York State Department of Transportation required that EklecCo obtain an expression of intent from the Town Board that the Town intended to accept public dedication of a portion of that "ring road," as well as certain roadways connecting the ring road to other major thoroughfares. (*Id.*)

On January 22, 1991, the Town Board passed a resolution expressing its intent to accept dedication of such roads, subject to EklecCo's agreement to construct and maintain them at its sole cost and expense, and to post a bond or letter of credit "of sufficient amount to more than adequately cover long term maintenance and future repairs." (*Id.* ¶ 41.)

Subsequently, on March 9, 1993, EklecCo applied to the Planning Board for approval of modifications to the previously approved preliminary site plan for the Palisades Center. (*Id.* ¶ 42.) This modified plan included the development of only 330,000 square feet of GLA ("Tower I") and deferred the construction of the approximately 550,000 square feet of the additional GLA. (*Id.*) The Town Board granted the preliminary site plan approval for Tower I on March 24, 1993, and eventually granted final site approval for the construction of Tower I on June 23, 1993. (*Id.* ¶¶ 43–44.)

On December 28, 1994, EklecCo applied to the Planning Board for preliminary approval to increase the size of the Palisades Center to include 1.2 million square feet of GLA. (*Id.* ¶ 46.) The Town Board issued a negative declaration pursuant to the New York State Environmental Quality and Review Act ("SEQRA")—finding that EklecCo's planned development was consistent with the Town's zoning laws and did not have adverse environmental consequences—

and granted preliminary site plan approval on February 1, 1995. (*Id.* ¶ 47.) The Town Board eventually issued a resolution granting final site plan approval on May 17, 1995. (*Id.* ¶ 49.)

**B. EklecCo's Application to Increase the Size of the Palisade's Center**

On December 22, 1995, EklecCo applied to the Planning Board for preliminary site plan approval to increase the size of the Palisades Center from 1.2 million square feet of GLA to 1.854 million square feet of GLA. (*Id.* ¶ 50.) The Planning Board granted preliminary site plan approval on February 28, 1996, subject to certain conditions. (*Id.* ¶ 51.) On March 27, 1996, however, the Planning Board issued an "Addendum" to its previous approval and imposed additional conditions to be satisfied by EklecCo prior to final site plan approval. (*Id.* ¶ 52.) These additional conditions required EklecCo to "secure Town Board approval for discontinuance of Virginia Avenue and Besso Street," as portions of those roads would become part of the building footprint of the Palisades Center (*Id.* ¶¶ 53–54.)

On April 5, 1996, the Office of the Building Inspector for the Town of Clarkstown ("Building Department") issued a building permit granting EklecCo authorization to proceed with the construction of the foundation of the mall. (*Id.* ¶ 55.) Shortly thereafter, on April 24, 1996, the Planning Board passed a resolution granting final site plan approval for the Palisades Center, to include 1.854 million square feet of the GLA (the "Final Site Plan Approval"), subject to certain conditions. (*Id.* ¶ 56.) Many of the conditions included in the Final Site Plan Approval were consistent with the prior requirements that the Town Board had imposed as a part of the earlier Rezoning Resolution. (*Id.* ¶ 57.) Moreover, the conditions included in the Final Site Plan Approval reiterated that EklecCo was required to secure Town Board approval for the discontinuance of certain Town Roads. (*Id.* ¶ 60.) At that time, the Town Board intended to discontinue and abandon the Town Roads to EklecCo in order to allow the construction of the

Palisades Center to proceed at 1.854 million square feet of GLA. (*Id.* ¶ 61.)

Indeed, on May 24, 1996, the Town Board convened a special meeting and authorized the Town Supervisor to sign an agreement with EklecCo (the "Shell Permit Agreement") that would permit the Building Inspector to issue a shell building permit for the Palisades Center, in exchange for certain payments and other assurances from EklecCo. (*Id.* ¶ 63.) This Shell Permit Agreement provided, among other things, that: (1) the building department would issue a shell building permit (in order to permit EklecCo to obtain a $50,000,000.00 construction loan from Marine Midland Bank); (2) EklecCo would, at the time of the loan, pay the Town $1,500,00.00 for certain land declared surplus by the Town and execute a leaseback of that land to the Town for use as a compost facility for a period of ninety-nine years; (3) such leaseback of property for the composting facility would not affect EklecCo's floor area ratio calculation ("FAR"); and (4) EklecCo would, on or prior to June 17, 1996, furnish the Town a $2,000,000.00 Irrevocable Letter of Credit or Payment Bond guaranteeing payment to the Town the sum of $2,000,000.00 as a contribution toward the Hackensack Flood Control Project. (*Id.*)

EklecCo alleges that at the time the Town Board authorized the Shell Permit Agreement, it was aware of EklecCo's intention to apply to expand the Palisades Center to include 3.05 million square feet of GLA. (*Id.* ¶ 64.) Indeed, Plaintiffs maintain that the Town Board included the provision regarding EklecCo's FAR calculation to facilitate EklecCo's expansion application—to assure EklecCo that the leaseback provision would not preclude EklecCo from including the purchased land in its expansion application. (*Id.* ¶ 65.) Moreover, the Town knew that the issuance of the building permit was a requirement of the $50,000,000.00 construction loan and that EklecCo intended to proceed with construction activities that were to be funded by that loan. (*Id.* ¶ 66.) Further, the Building Department issued a building permit to EklecCo the

same day the Shell Permit Agreement was executed, thereby permitting EklecCo to begin construction of the building shell of the Palisades Center. (*Id. ¶* 67.)

### C. EklecCo's Application for Further Expansion

On July 17, 1996, EklecCo formally applied to the Planning Board to amend the Final Site Approval to increase the size of the Palisades Center from 1.854 million square feet of GLA to 3.05 million square feet of GLA. (*Id. ¶* 68.) This proposed expansion was to be achieved through the addition of floors above the existing footprint, resulting in a vertical rather than horizontal expansion, which complied with the Town's zoning law. (*Id. ¶¶* 68–69.) EklecCo's pursuit of the proposed expansion, however, prompted a vocal minority to oppose any increase in the size of the Palisades Center beyond the already approved 1.854 million square feet of GLA. (*Id. ¶* 73.)

### D. Expected Discontinuance and Abandonment of the Town Roads

In August of 1996, the Town's Supervisor met with a representative of EklecCo and assured them that the Town would discontinue and abandon the Town Roads to EklecCo, as required by the Final Site Plan Approval. (*Id. ¶* 75.) Further, in a letter dated October 8, 1996, the Town's Superintendent of Highways—the Town official charged with ensuring the adequacy, maintenance, and safety of the Town's roads—advised the Town's Supervisor and the Town Board that the Town Roads would become useless once EklecCo's ring road was completed. (*Id. ¶* 79.) Further, these roads were known to be dangerous and prone to regular flooding. (*Id.¶¶* 83–84.)

By September 19, 1996, EklecCo had substantially complied with the other conditions set forth in the Final Site Plan and had applied to the Town Board for discontinuance and abandonment of the Town Roads. (*Id. ¶* 76.)

### E. The Roads Resolution

The Town Board convened on October 8, 1996 to decide whether to accept the judgment of the Town Highway Superintendent and consent to discontinue and abandoned the flood-prone Town roads. (*Id.* ¶ 88.) On that date, EklecCo already had the Planning Board's approval to build the Palisades Center at 1.854 million square feet, subject to the discontinuance of the roads. (*Id.* ¶ 89.) Moreover, EklecCo's application to expand the Palisades Center to 3.05 million square feet of GLA—a decision not before the Town Board—was already progressing in normal course before the Planning Board. (*Id.* ¶ 91.) However, Plaintiffs contend that the Town Board used the expected formality of its vote to discontinue the Town Roads to block the already approved development of the Palisades Center at 1.854 million square feet of the GLA and impose a number of restrictions and conditions on the Palisades Center's construction. (*Id.* ¶ 92.)

On that same date, the Town Board passed resolution 909-1996 (the "Roads Resolution"). (*Id.* ¶ 93.) Under the Roads Resolution, the Town Board consented to the discontinuance of the Town Roads pursuant to Highway Law § 171(2), and resolved that, upon the acceptance of the substitute roads to be built and maintained by EklecCo, the Town Roads would be abandoned and sold to EklecCo pursuant to Highway Law § 212a, subject to certain terms and conditions. (*Id.* ¶¶ 96–99.) Specifically, the Roads Resolution required that EklecCo pay a $1.5 million purchase price for the Town Roads, and set forth the following additional terms of the transaction:

(a) EklecCo's withdrawal of the Palisades Center Expansion Application;

(b) EklecCo, waiving releasing and covenanting not to sue the Town, the Town Board, or any town employees, agents, or representatives 'with respect to or in connection with any action taken . . . up to and including the adoption of [the] Resolution;'

(c) EklecCo 'covenanting and agreeing to file an Amendment to the Covenants filed in compliance with the 1988 Rezoning Resolution precluding any further increase in the size of the Palisades Center in excess of the 1.85 million square feet of GLA without prior consent of the Town Board, the application for which, in no event, shall occur prior to twenty-four (24) months after the Palisades Center is open and operating at 90% occupancy;'

(d) EklecCo 'covenanting and executing an easement in favor of the Town restricting all real property owned by EklecCo within the Site Plan, precluding any further increase in the size of the Palisades Center in excess of 1.854 million of square feet GLA which restriction shall bind EklecCo and its successors, and which shall be a covenant running with the land for the benefit of the Town of Clarkstown;'

(e) EklecCo agreeing 'that any modifications or release of the covenant cannot be made prior to twenty four (24) months after the Palisades Center is open and operating 90% occupancy and any such release or modification shall be deemed a transfer of the real property interests of the Town pursuant to Town Law § 64(2), and thus be subject to permissive referendum;'

(f) EklecCo agreeing 'to enter into a Project Labor Agreement ("PLA") with the Building and Construction Trades Council of Rockland County for a labor agreement . . . .'

(*Id.* ¶ 99.)

By the time the Roads Resolution passed, EklecCo had substantially complied with the numerous conditions imposed upon it in order to complete the Palisades Center in accordance

with the Final Site Plan Approval, and had already spent and committed tens of millions of dollars in the construction of the Palisades Center. (*Id.* ¶ 107.) For example, EklecCo commenced excavation and site preparation work in early 1990, after the Planning Board granted EklecCo: a) preliminary site plan approval for the Palisades Center; and (b) permission to begin excavation and rock removal. (*Id.* ¶ 109.) In addition to the Planning Board approvals, EklecCo also relied upon approvals from the Building Department and the Town Board, which permitted EklecCo to construct the piles, caps, grade beams, footing, foundations, and begin construction of the building shell of the Palisades Center. (*Id.* ¶ 110.)

By October 1996, EklecCo had also invested tens of millions of dollars in project approval, site development and building construction—including $12 million in costs for the closure of landfills and environmental remediation. (*Id.* ¶ 112.) Moreover, the Town Board was aware of EklecCo's significant investment in developing and constructing the Palisades Center. (*Id.* ¶ 114.)

### F.  The Restrictive Covenant

On October 21, 1996, EklecCo withdrew its application to the Planning Board for approval of the expansion of the mall to 3.05 million square feet of GLA. (*Id.* ¶ 117.) Shortly thereafter, on December 9, 1996, EklecCo and the Town entered into a "Restrictive Covenant and Negative Easement." (*Id.* ¶ 118.) The restrictive covenant described the "Burdened Estate" as the property that EklecCo owned and intended to use to build the mall and the "Benefitted Estate" as "certain lands underlying Town Highways adjacent to and in the vicinity of the Burdened Estate," including "lands or parts of land underlying Virginia Avenue, Besso Street, and the Route 59-a service road." (*Id.* ¶ 122.)

The restrictive covenant provided that, pursuant to paragraph 4(c) of the Roads Resolution,

EklecCo was "precluded from any increase in the size of the [Palisades Center] in excess of the 1.854 million square feet of the Gross Leasable Area shown on the Final Site Plan Approval, without the prior release of this Covenant by the Clarkstown Town Board . . . ."(*Id.* ¶ 124.)

The Restrictive Covenant also provided that the parties acknowledged "that the interest created by this Covenant is an interest in real property in the nature of an easement, and that any modification or release of [the] Covenant is and shall be deemed a transfer of real property." (*Id.* ¶ 125.) The covenant further specified that it would be "in perpetuity," "run with the land," and "be binding upon EklecCo and all future owners of the Project Property." (*Id.* ¶ 126.)

### G. The Endorsed Amended Final Site Plan Approval

On January 12, 1998, the Chairman of the Planning Board endorsed an amended final site plan for a 1.854-million-square-foot mall, which included "Note Z." (*Id.* ¶¶ 142–144.) Note Z again limited the approval of the site plan to no more than 1.854 million square feet of GLA and made the leasing of additional space subject to Planning Board approval following an environmental assessment and stated that an application for such approval "shall not be made until compliance with the applicable statute of limitations of Town Board Resolution of 909-1996." (*Id.* 144.)

### H. The Sale of the Town Roads

On January 28, 1997, the Town Board passed Resolution 96-1997, authorizing the Town Supervisor to complete the discontinuance and abandonment of the Town Roads and to sign a contract for the sale of the Town Roads. (*Id.* ¶ 132.) The Supervisor executed a contract for the sale of the Town Roads with EklecCo on January 29, 1997. (*Id.* ¶ 133.) The Supervisor subsequently conveyed the Town Roads to EklecCo via quit claim deed. (*Id.* ¶135.)

## I. EklecCo's Attempt to Obtain Release of the Restrictive Covenant

In 2002, EklecCo applied to the Town Board to obtain release of the Restrictive Covenant and permit EklecCo to pursue expansion of the GLA of the Palisades Center within the existing building shell. (*Id.* ¶ 148.) In response, the Town Board enacted a pair of resolutions authorizing submissions of a proposition to release the covenant to the voters at a special election to be held simultaneously with the general election on November 5, 2002. (*Id.* ¶¶ 149–52.) The voters rejected the proposal to release the restrictive covenant on November 5, 2002. (*Id.* ¶ 154.)

To date, EklecCo faces the same GLA limit imposed by the restrictive covenant and is, thus, prevented from leasing space within the Palisades Center that would otherwise be leasable and cannot develop unused and unfinished space that already exists within the Palisades Center to make that space leaseable. (*Id.* ¶¶ 156–58.) Nor can EklecCo seek approval from the Planning Board to build and occupy additional GLA outside the existing building shell—though such expansion is otherwise permitted pursuant to the Town's zoning laws. (*Id.* ¶ 159.)

## II.    Procedural Background

EklecCo commenced the present § 1983 action against the Town, the Town Board, the Planning Board, and the Town Supervisor on August 16, 2016. (*See* Compl., ECF No. 1.). EklecCo subsequently filed an amended complaint on September 2, 2016. (*See* First Amended Complaint ("FAC"), ECF No. 18.)

On September 21, 2016, Defendants filed a letter motion seeking leave to file a motion to dismiss. (ECF No. 28.) On February 8, 2017, this Court issued an Order waiving the pre-motion conference and granting Defendants leave to file their motion. (ECF No. 31.) Defendants filed the present motion to dismiss the First Amended Complaint pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6) on May 12, 2017. (ECF No. 41.)

## LEGAL STANDARDS

On a motion to dismiss for "failure to state a claim upon which relief can be granted,"
Fed. R. Civ. P. 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));
*accord Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "Although for the purposes of a
motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is]
'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S.
at 679 (*quoting Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework
of a complaint, they must be supported by factual allegations." *Id.* at 679.

When there are well-pleaded factual allegations in the complaint, "a court should assume
their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*
A claim is facially plausible when the factual content pleaded allows a court "to draw the
reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.
Ultimately, determining whether a complaint states a facially plausible claim upon which relief
may be granted is "a context-specific task that requires the reviewing court to draw on its judicial
experience and common sense." *Id.* at 679.

As to a motion brought under Rule 12(b)(1), "[a] case is properly dismissed for lack of
subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or
constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.
2000).

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

## DISCUSSION

### I.  Federal Claims

Plaintiffs assert both federal and state law claims in the First Amended Complaint. Though the parties often conflate the two in their motion papers, for ease and clarity, the Court will address those claims separately.

Plaintiffs' federal claims ostensibly include Fifth and Fourteenth Amendment claims for damages and declaratory relief, raised pursuant to 42 U.S.C. § 1983.[3] (*See* FAC ¶¶ 168–196; 226–233, 248–262.) Specifically, Plaintiffs contend that the conditions imposed by Defendants

---

[3] Though Plaintiffs also purport to assert independent claims pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that act "is procedural only . . . and does not create an independent cause of action." *Norton v. Town of Islip*, 678 F. App'x 17, 22 (2d Cir. 2017) (summ. order) (internal quotation marks omitted) (citing *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012)). Rather, the act simply "enlarges the range of available remedies for rights established elsewhere." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, No. 09-CV-471 (NAM) (ATB), 2015 WL 13540213, at *10 (N.D.N.Y. Sept. 8, 2015) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). Because Plaintiffs' claims for declaratory relief are premised on the same constitutional violations comprising their § 1983 claims, the Court evaluates those claims in conjunction; if Plaintiffs' claims for relief pursuant to § 1983 fail, so must their claims for declaratory relief. *See Springfield Hosp. v. Hofmann*, 488 F. App'x 534, 535 (2d Cir. 2012) (sum order) (holding that a plaintiff "cannot maintain an action for declaratory judgment without an underlying federal cause of action").

on the discontinuance of the Town Roads (1) constituted unconstitutional land use exactions, in

violation of the Fifth Amendment,[4] and (2) violated Plaintiffs' Fourteenth Amendment equal

---

[4] EklecCo appears to have conflated a number of distinct claims in its First Cause of Action—raising First, Fifth, and Fourteenth Amendment claims under the umbrella of "exactions." (*See* FAC ¶¶ 168–187.) However, the "exactions" doctrine espoused by the Supreme Court in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013)—on which EklecCo presently relies—is an application of the unconstitutional conditions doctrine that is specific to the Fifth Amendment's Takings Clause. *See Koontz*, 570 U.S. at 604; *see also W. Linn. Corp. Park L.L.C. v. City of W. Linn*, 534 F.3d 1091, 1100 n.4 (9th Cir. 2008) (defining an exaction as "a condition of development that local government places on a landowner to dedicate a *real interest in the development property* for public use" (emphasis added)).

To the extent that EklecCo wishes to assert a First Amendment claim under the unconstitutional conditions doctrine, different—and perhaps even more stringent—standards would apply. Indeed, the Supreme Court has recognized that the unconstitutional conditions doctrine "has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question." *Dolan*, 512 U.S. at 407 n.12. Rather, its application varies depending on the underlying substantive right at issue. Thus, the Supreme Court formed its land use exactions doctrine considering "[t]he necessary and traditional breadth of municipalities' power to regulate property development, together with the absence [ ] of fragile and easily 'chilled' constitutional rights such as that of free speech." *Id.* The relevant considerations would be distinct in the context of a First Amendment claim.

However, EklecCo failed to independently plead a First Amendment claim, and seemingly tied its First Amendment grievances to its exactions claim in the First Amended Complaint. (*See* FAC ¶¶ 176–182.) Indeed, the exact nature of Plaintiffs' potential First Amendment claim remained unclear on the face of Plaintiffs' pleadings, which relied heavily on the land use exactions doctrine.

EklecCo eventually elaborated its First Amendment claim in its opposition to Defendants' motion to dismis. Specifically, EklecCo clarified its position that Defendants unconstitutionally burdened its First Amendment right to (1) petition the Planning Board to expand the Palisades Center, and (2) petition the judicial system for redress, and that such First Amendment claims were independent from the Fifth Amendment takings issue. (Pls.' Mem. of Law. in Opp. to Defs.' Mot. Dismiss ("Pls.' Opp.") at 11, ECF No. 45.) However, Plaintiffs cannot change the nature of their claims in their opposition to Defendants' motion to dismiss. *See Cooper v. Slice Technologies, Inc.*, No. 17-CV-7102 (JPO), 2018 WL 2727888, at *5 n.3 (S.D.N.Y. June 6, 2018) ("The Court will not consider [a] cause of action raised for the first time in opposition to the motion to dismiss."); *see also Ebusinessware, Inc. v. Tech. Servs. Grp. Wealth Mgmt. Sols., LLC*, 08-CV-09101 (PKC), 2009 WL 5179535, at *14 (S.D.N.Y. Dec. 29, 2009) (dismissing counterclaim where parties attempted to change its nature in their opposition to a motion to dismiss). Because Defendants were deprived of an opportunity to fully brief the issue given the shortcomings of the First Amended Complaint, the Court will not consider Plaintiffs' *independent* First Amendment claim articulated for the first time in Plaintiffs' opposition.

protection rights. The Court now considers each claim in turn.

## A.  Fifth Amendment Takings Claim—Land Use Exactions

The Takings Clause of the Fifth Amendment, made applicable to states through the

Fourteenth Amendment, *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005), provides that

"private property [shall not] be taken for public use, without just compensation." U.S. Const.

amend. V. This protection extends to two types of takings: physical and regulatory. *Id.* at 537.

Physical takings involve "the direct government appropriation or physical invasion of private

property." *Id.* Regulatory takings, on the other hand, involve "government regulation of private

property [that is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster."

*Id.* Thus, "while property may be regulated to a certain extent, if regulation goes too far it will be

recognized as a taking." *Id.* (internal quotation marks omitted) (quoting *Pennsylvania Coal Co.*

*v. Mahon*, 260 U.S. 393, 415 (1922)).

Moreover, under the unconstitutional conditions doctrine, a taking that would be

unconstitutional if imposed directly may not be imposed through indirect, though coercive,

measures. That is, the government may not condition a discretionary benefit—like a building

permit or grant—on an individual's surrender of their Fifth Amendment right to just

compensation. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013)

(takings clause violated by conditioning approval of land-use permit on monetary exaction that

lacked nexus to proposed project); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987)

(government could not require an uncompensated conveyance of property from a property owner

---

Further, because the viability of Plaintiffs' alluded to—though not properly raised and briefed—First Amendment claim may significantly impact the validity of the release and waiver of claims executed by EklecCo, this Court declines to reach the issue of release or waiver until the parties have a full and fair opportunity to brief any potential First Amendment claim.

as a condition for a land use permit when the government otherwise would not be able to require this conveyance without paying just compensation).

In the present action, Plaintiffs contend that Defendants violated their rights by unconstitutionally conditioning the discontinuance of the Town Roads on, *inter alia*, Plaintiffs' agreement to limit the Palisades Center to 1.85 million square feet of GLA and purchase certain roads surrounding their property for $1.5 million. (FAC ¶¶ 176–87.) Defendants argue, however, that any takings claim based on the conditions imposed for the discontinuance of the Town Roads accrued nearly two decades before this action was commenced and are, thus, time barred. (Defs.' Mem. of Law in Supp. Mot. Dismiss ("Defs.' Mot.") at 12–13, ECF No. 43.) This Court agrees.

### i. Applicable Law

"The statute of limitation for actions under § 1983 is the statute of limitations applicable to personal injury actions occurring in the state in which the federal courts sits." *Condit v. Bedford Cent. Sch. Dist.*, No. 16-CV-6566 (CS), 2017 WL 4685546, at *7 (S.D.N.Y. Oct. 16, 2017) (internal quotation marks and citation omitted); *see also Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015). New York law provides for a three-year statute of limitations for personal injury claims. N.Y.C.P.L.R § 214(5). Thus, the applicable statute of limitations for § 1983 claims in New York is three years. This "three-year limitations period applies regardless of whether Plaintiff seeks legal, equitable, or declaratory relief."[5] *Ruane v. Cty. of Suffolk*, 923 F. Supp. 2d 454, 458 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).

---

[5] Plaintiffs' claims for relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, are governed by the same statute of limitations applicable to Plaintiffs' § 1983 claims. *See Ruane v. Cty. of Suffolk*, 923 F. Supp. 2d 454, 458 n.3 (E.D.N.Y. 2013) ("[Plaintiff's] declaratory

The accrual of claims brought under § 1983, however, is a question of federal law. *See*

*Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017). Generally, a claim will accrue once a plaintiff

"knows or has reason to know of the injury which is the basis of his action." *Cornwell v.*

*Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (internal quotations marks omitted) (quoting

*Singleton v. New York*, 632 F.2d 185, 191 (2d Cir. 1980)). One notable, yet narrow, exception to

this general principle is the "continuing violation doctrine." *Gonzalez v. Hasty*, 802 F.3d 212,

220 (2d Cir. 2015).

Under the continuing violation doctrine, where a claim by its nature requires that a

plaintiff be "subjected to some threshold amount of mistreatment," "the limitations period begins

to run when the defendant has engaged in enough activity to make out an actionable . . . claim."

*Id.* (internal quotation marks omitted). The doctrine is, thus, limited "to claims composed of a

series of separate acts that collectively constitute one unlawful [ ] practice." *Gonzalez*, 802 F.3d

at 220 (internal quotation marks omitted).

ii.     **Application**

---

judgment claim rests on the same unconstitutional practices that support her [§] 1983 due process
claims. Thus, all of [Plaintiff's] claims are treated the same for the purposes of statute of
limitations."). "Otherwise, the statute of limitations [could] be circumvented merely by draping
[a] claim in the raiment of the Declaratory Judgment Act." *Arezzo v. City of Hoboken*, 719 F.
App'x 115, 119 (3d Cir. 2018) (internal quotation marks and alterations omitted); *see also*
*Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993) (holding that a Fifth
Amendment takings claim for declaratory judgment was subject to the same statute of limitations
applicable to § 1983 claims); *Gilbert v. City of Cambridge*, 932 F.2d 51, 57–58 (1st Cir. 1991)
("To prevent plaintiffs from making a mockery of the statute of limitations by the simple
expedient of creative labelling—styling an action as one for declaratory relief rather than for
damages—courts must necessarily focus on the substance of an asserted claim as opposed to its
form. It is settled, therefore, that where legal and equitable claims coexist, equitable remedies
will be withheld if an applicable statute of limitations bars the concurrent legal remedy.")

Typically, Fifth Amendment takings claims "accrue on the date when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." *Ladd v. United States*, 646 F.3d 910, 912 (Fed. Cir. 2011); *see also Stephen v. Murray*, No. 14-CV-4951 (MKB), 2016 WL 4402020, at *2 (E.D.N.Y. Aug. 17, 2016) ("A cause of action accrues under section 1983 'when the plaintiff has a complete and present cause of action.'" (quoting *Wallace v. Keto*, 549 U.S. 384, 388 (2007))). Though the Second Circuit has not squarely addressed the issue, other federal circuit courts have ruled that any *facial* challenge to a statute, regulation, or ordinance under the Fifth Amendment Takings Clause accrues at the time that the challenged statute or regulation was enacted or became effective. *See, e.g., Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948, 956 (9th Cir. 2011) ("[T]he statute of limitations for facial challenges to an ordinance runs from the time of adoption"); *Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*, 659 F.3d 42, 50 (1st Cir. 2011) ("[I]t is clear that a facial takings challenge accrues at the time the offending statute or regulation is enacted or becomes effective."); *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 521 (6th Cir. 1997) (holding that a facial takings claim accrued upon the enactment of the challenged statute).

While some district courts in this Circuit have declined to adopt this principle in the past— opting instead to apply the continuing violation doctrine to facial takings claims, *see,e.g, S.Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 557 (D. Conn. 2008)—this Court finds the accrual-upon-adoption approach compelling for two primary reasons.

First, as the Ninth Circuit has aptly explained:

> [i]n the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a

property interest. This is a single harm, measurable and compensable when the
statute is passed.

*Colony Cove Properties*, 640 F.3d at 956 (internal quotation marks omitted) (quoting

*Guggenheim v. City of Goleta*, 638 F.3d 1111, 1119 (9th Cir. 2010)). Facial Fifth Amendment

takings claims are, thus, distinct from other constitutional challenges to statutes or regulations

where the harm stems from the challenged statute's continued enforcement or application.[6]

*Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993). In such instances, each

day the statute is enforced constitutes "a continuing and accumulating harm." *See Kuhnle*, 103

F.3d at 522. In contrast, the harm associated with a taking—the burdening of property rights or

depreciation of property value—is complete as soon as the purported taking is effectuated via the

challenged statute. *See Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1282 (11th Cir. 2014)

("[A]ny deprivation of property that [the appellant] suffered was fully effectuated when [the

county ordinance] was enacted, and the statute of limitations began to run at that time." (internal

quotation marks omitted)).

---

[6] The Court finds the Sixth Circuit's analysis on this very issue in *Kuhnle Brothers, Inc. v.
County of Geauga*, 103 F.3d 516 (6th Cir. 1997), instructive. In *Kuhnle*, a trucking company
commenced a § 1983 suit against the County of Geauga, alleging that an ordinance barring large
trucks from driving on certain county roads was unconstitutional. *Id.* at 518. Specifically, the
trucking company alleged that the ordinance constituted an unlawful taking without just
compensation under the Fifth Amendment and an unconstitutional deprivation of their property
and liberty interests under the Due Process Clause. *Id.* The Sixth Circuit held that the trucking
company's takings and property-based due process claims were time-barred because the injury
for each of those claims—the purported burden on plaintiff's property interest—was complete
upon the enactment of the statute, which occurred outside the limitations period.

    In contrast, the Sixth Circuit ruled that plaintiff's substantive due process claim for
deprivation of liberty was *not* time-barred. *Id.* at 522. The Court reasoned that, to the extent
plaintiff had a liberty interest in intrastate travel, the ordinance actively deprived plaintiff of that
asserted constitutional right every day that it remained in effect. *Id.* The Court further reasoned
that unlike a single, measurable, and compensable taking, "[a] law that works an ongoing
violation of constitutional rights does not become immunized from legal challenge for all time
merely because no one challenges it within [the limitations period]." *Id.*

Second, "[a]s a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit." *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Trinidad v. New York City Dep't of Correction*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006)); *see also Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) ("[C]ourts in the Second Circuit have been loath to apply [the continuing violation doctrine] absent a showing of compelling circumstances." (internal quotation marks and citation omitted)). This Court is, thus, hesitant to expand the application of that doctrine beyond its typical scope.

Plaintiffs' present takings claim, however, does not fit the mold for the continuing violation doctrine. The Second Circuit has largely limited the continuing violation doctrine to claims "composed of a series of separate acts that collectively constitute one unlawful [ ] practice." *Gonzalez*, 802 F.3d at 220 (internal quotation marks omitted). Indeed, the doctrine was born of hostile work environment claims, which often require pervasive acts that, alone, would not be actionable, but nevertheless give rise to a claim when considered in their totality. *See Fleming v. Verizon New York, Inc.*, 419 F. Supp. 2d 455, 465 (S.D.N.Y. 2005). In such instances, because a plaintiff could not bring an action challenging each individual act, the continuing violation doctrine acts to ensure that no unlawful practice is immunized from suit merely by its protracted nature.

For instance, the Second Circuit held in *Sherman v. Town of Chester* that the continuing violation doctrine applied to an as applied takings claim where the Town blocked the development of a housing unit through "an unusual series of regulations and tactical maneuvers that constitute[d] a taking when considered together, even though no single component [was] unconstitutional when considered in isolation." 752 F.3d 554, 567 (2d Cir. 2014). To hold

otherwise, the Court reasoned, "would mean that a government entity could engage in conduct that would constitute a taking when viewed in its entirety, so long as no taking occurred over any three-year period." *Id.* at 566.

The present case, however, does not raise similar concerns. Plaintiffs challenge the very same conditions that were imposed nearly two decades ago and enforced as early as 2002—when EklecCo applied to the Town Board to obtain release of the restrictive covenant and permit expansion of the Palisades Center within the existing building shell. (FAC ¶ 148.) Thus, unlike the "death by a thousand cuts" at issue in *Sherman*, 752 F.3d at 566, Plaintiffs' takings claim in the present action involves a single fatal blow: the conditions placed on the discontinuance of the Town Roads, including the limit on the Palisades Center's GLA. Plaintiffs could—and should— have challenged the constitutionality of those conditions upon their imposition.

Accordingly, this Court finds that the continuing violation doctrine is inapplicable to Plaintiffs' takings claims. Plaintiffs' Fifth Amendment claim, thus, accrued well before the three-year limitations period and Defendants' motion to dismiss is granted as to that claim. *See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

### B. Fourteenth Amendment Equal Protection Claim

Defendants next contend that Plaintiffs' Fourteenth Amendment equal protection claim must be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court agrees and dismisses Plaintiffs' Fourteenth Amendment claim.

### i. Applicable Law

The Fourteenth Amendment to the United States Constitution declares that " [n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (internal quotations marks omitted) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).

"Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Artec Constr. & Dev. Corp. v. City of New York*, No. 15-CV-9494 (KPF), 2017 WL 5891817, at *3 (S.D.N.Y. Nov. 28, 2017) (internal quotation marks omitted); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

"A plaintiff who does not allege any protected class affiliation can [ ] demonstrate an equal protection violation where the plaintiff shows that he or she was treated differently from similarly situated individuals in circumstances where there was no rational basis for the difference in treatment ('class of one'), or where the different treatment was based on a malicious or bad-faith intent to injure ('selective enforcement')." *Id.* at *4.

The first of these claims—a class-of-one equal protection claim—requires that the plaintiff allege "that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate governmental policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of mistake." *Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (internal quotation marks and citation omitted). "Plaintiffs proceeding under this theory 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7 (S.D.N.Y.) (internal quotation marks omitted) (quoting *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010)), *aff'd*, 705 F. App'x 50 (2d Cir. 2017).

On the other hand, to state a selective enforcement equal protection claim "a plaintiff must show that: (1) 'he, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff.'" *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (alterations omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). "[T]here is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory." *Panzella*, 231 F. Supp. 3d at 7. Indeed, "[w]hile some courts evaluate whether a comparator is similarly situated under the same standard used in 'class of one' equal protection claims, others apply a less demanding standard to selective enforcement claims." *Id.* (internal citations omitted).

Notwithstanding this split among courts in our Circuit, whether two comparators are sufficiently similarly situated is generally a factual issue for the jury under either claim. *See Dekom v. Nassau Cty.*, 595 F. App'x 12, 14 (2d Cir. 2014) (noting that "the question whether other individuals are similarly situated to a plaintiff is ordinarily a question of fact"). However, "[w]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component" of either claim. *Bishop v. Best Buy, Co. Inc.*, No. 08-CV-8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (internal quotation marks and citations omitted), *aff'd sub nom. Bishop v. City of New York*, 518 F. App'x 55 (2d Cir. 2013); *Vaher*, 916 F. Supp. 2d at 434 ("While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." (internal quotation marks and citation omitted)). Thus, an equal protection claim under either theory is properly dismissed where a plaintiff fails to adequately plead the existence of any similarly-situated individuals.

ii. **Application**

Defendants contend that Plaintiffs' equal protection claim—both under the class-of-one and selective enforcement theories—must be dismissed as Plaintiffs failed to identify even one similarly-situated comparator. This Court agrees.

The First Amended Complaint contains only the conclusory assertion that "EklecCo is [ ] treated differently than all other similarly situated property owners in the Town." (FAC ¶ 221.) Beyond that threadbare recital, however, EklecCo failed to allege particular facts relating to any purported comparator in the First Amended Complaint. While EklecCo eventually named the Shops at Nanuet—another large shopping center that exists in the Town—as a valid comparator

in its opposition to Defendants' motion, it is "axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss." *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *1 (S.D.N.Y. Sept. 25, 2014), *aff'd*, 614 F. App'x 32 (2d Cir. 2015). Accordingly, the Court need not, and will not, consider these new factual allegations and Plaintiff's equal protections claims are dismissed for failure to state a claim.

Plaintiffs, however, are granted leave to replead their equal protection claims. Although Defendants contend that any dismissal of Plaintiffs' equal protection claim should be *with* prejudice (Defs.' Reply Mem. of Law ("Defs.' Reply") at 12–13, ECF No. 50), Plaintiffs have requested leave to amend their complaint to include sufficient factual allegation regarding possible comparators. (Pls.' Opp. at 27 n.21.) Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to amend a complaint "when justice so requires." Further, the Second Circuit has noted that Rule 15(a)'s "permissive standard is consistent with [this Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (internal quotation marks omitted). Accordingly, this Court finds dismissal without prejudice the most prudent course of action.[7]

## II. State Law Claims

Because Plaintiffs have not yet adequately pled a federal cause of action, the Court declines to consider the remaining state law claims at this time. If Plaintiffs fail to amend their pleadings to adequately state a federal claim, any state law claims will be dismissed without

---

[7] The Court cautions Plaintiffs, however, to consider the statute of limitations when deciding whether to replead their equal protection claim—any claim that accrued more than three years prior to the commencement of this action will be dismissed as time barred. *See Fahs Const. Grp.*, 725 F.3d at 292 ("The statute of limitations on an Equal Protection claim brought in New York under 42 U.S.C. § 1983 is three years.").

prejudice to filing those claims in state court. *See Norton v. Town of Islip*, 678 F. App'x 17, 22 (2d Cir. 2017) (summ. order) ("[I]n the absence of any surviving federal claims, . . . 'the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also Oneida Indian Nation of New York v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011) ("[W]e have repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well." (internal quotation marks omitted)).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiffs' Fifth Amendment takings claim is dismissed, with prejudice, as time barred. Plaintiffs' Fourteenth Amendment claim is dismissed without prejudice.

Plaintiffs shall have until July 13, 2018 to amend the First Amended Complaint in accordance with this Court's decision. If Plaintiffs elect to file a Second Amended Complaint, Defendants shall have until 21 days from the date of Plaintiffs' filing to move or file responsive pleadings. If Plaintiffs fail to amend their pleadings by the aforementioned date, the entirety of this action, including Plaintiffs' state law claims, will be dismissed.

The Clerk of the Court is directed to terminate the motion at ECF No. 41.

Dated:   June 18, 2018                   SO ORDERED:
         White Plains, New York

NELSON S. ROMÁN
United States District Judge